UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| **WHITNEY BISHOP, individually and as next friend of M.S., K.B., and D.B., her minor children,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| vs. | ) Cause No. 1:13-cv-2057-WTL-TAB ) |
| **MARION COUNTY SHERIFF, et al.,** | ) ) |
| **Defendants.** | ) |

### ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the motion for summary judgment filed by Defendants Lakesha Tarrance and Yoronda Caudle (Dkt. No. 62) and the motion for partial summary judgment filed by Defendants Henry Turner, K. Sanders, and the Marion County Sheriff (collectively referred to as the "Sheriff Defendants") (Dkt. No. 71). The motions are fully briefed, and the Court, being duly advised, **GRANTS** the motions for the reasons set forth below.

### I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences

in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to 'scour the record in search of evidence to defeat a motion for summary judgment.'" *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001) (citation omitted).

## II. BACKGROUND

The facts of record, viewed in the light most favorable to the Plaintiffs, as the non-moving parties, are as follow.

Plaintiff Whitney Bishop brings this action on behalf of herself and as next friend of her children, D.B., K.B., and M.S. Demarkus Lloyd is the father of D.B. and K.B.

On March 6, 2013, Lloyd came to Bishop's apartment at 3034 N. Webster at about 1:30 a.m. Bishop was in the living room with her sister Jaime, who was on the couch holding D.B.; K.B. was asleep in a back room. An argument ensued between Lloyd and the two women, during which Lloyd pointed a gun at Bishop. Bishop then ran from the apartment and called 911. Four Indianapolis Metropolitan Police Department officers arrived and arrested Lloyd; he was charged with criminal confinement, pointing a fireman, and invasion of privacy. Lloyd did not reside at Bishop's apartment at that time; however, the arresting officer's case report characterized the incident as a "Firearms, Domestic, Live-in Boyfriend/Girlfriend" incident and stated that Jaime told the officer that Lloyd and Bishop were arguing about Lloyd "being home so late." Dkt. No. 70-1 at 5. It further stated that Jaime reported that "at some point Mr. Lloyd pulled out a silver hand gun and began to point it at her, she stated she got really scared and

2

picked up her niece, she stated he continued to yell and jab the gun at her while she had the child in her arms." *Id.* The police officers did not contact the Department of Child Services ("DCS") about the incident.

At his initial court appearance two days later, a no-contact order prohibiting Lloyd from contacting Bishop was entered. Lloyd was detained in the Marion County jail on an $80,000 bond. Neither Bishop nor her sister cooperated with the prosecutor with regard to the case against Lloyd.[1]

Due to an error by a deputy clerk of the Marion County Clerk's Office, the Marion County Sheriff's Office was directed to release Lloyd from jail on April 2, 2013.[2] The Sheriff's Office complied and released Lloyd in the early morning hours of April 3rd.

Also on April 2, 2013, following a motions hearing, the prosecutor in Lloyd's case reported to DCS that she had become aware of an incident of domestic violence that occurred in the presence of a child—specifically, the March 6th incident that took place in the presence of D.B.[3] The report was made by calling the Indiana Child Abuse and Neglect Hotline. The report completed by the Hotline employee states the following:

---

[1]The Plaintiffs correctly note that Tarrance's affidavit does not provide evidence of this fact because Tarrance lacks personal knowledge regarding whether Bishop cooperated with prosecutor. That is irrelevant, however, as Bishop herself testified in her deposition that she and her sister did not cooperate with the prosecutor.

[2]The Plaintiffs imply in their Statement of Material Facts in Dispute that the Sheriff was responsible for Lloyd's improper release because "it is the Sheriff's responsibility to oversee the jail." Dkt. 82 at 3. However, the uncontroverted evidence of record demonstrates that it was a deputy clerk's error that caused Lloyd to be released. The Plaintiffs point to no evidence or provision of law that suggests that the Sheriff had an obligation to second-guess the clerk's instructions.

[3]The Plaintiffs attempt to create an issue of fact about when the Hotline complaint was made by pointing out that Tarrance testified at the September 2013 hearing that the complaint was made on April 3rd, testimony which she now acknowledges was in error. The contemporaneous records of DCS demonstrate that the complaint was made on April 2nd; in any

3

> [D.B.] (4) resides with the mother, Whitney Bishop, and father, DeMarkus Lloyd. The family lives at 3034 N. Webster Ave. . . .
>
> RS states the mother and father got in a DV on 3/6/13. RS states the father pointed a gun at the child during the DV. RS states the father also pointed the gun and [sic] the mother as well. RS states the father was making threats as well. RS states the mother said the father did this because a sibling took him out drinking. The father came home intoxicated. The mother complained about how late the father came in. RS states the mother was held against her will. RS states the mother talked to the father at the jail about the father pointing the gun at the child.

The Hotline employee who took the report answered "no" to the question "is the child in imminent danger of serious bodily harm?" The employee determined that the report met the criteria to be "screened in," which means it was forwarded to the Marion County DCS office to be assessed.[4]

The report was received by supervisor Yoronda Caudle in the DCS's Marion County office, and the matter was assigned to Lakesha Tarrance, a Family Case Manager, to conduct an investigation. On April 3, 2013, Tarrance went to Bishop's home to begin her investigation. Bishop was not there, so Tarrance left a note asking Bishop to contact her at her office and advising that she needed to see her and her children immediately.

After arriving home later that day, Bishop went to her mother's home, where she had left D.B. and K.B. to be cared for by her mother, Ella Morris, for the day. Bishop and her mother

---

event, the date on which the complaint was made is irrelevant to the Court's resolution of the instant motions.

[4]The Plaintiffs' Statement of Material Facts in Dispute asserts that "the [Hotline] worker checks only one alleged maltreatment type marked in Section 2 of SDM Child Abuse and Neglect Screening and Response Time Assessment" and that "[t]o screen in a complaint for assessment two maltreatment categories should be checked." Dkt. No. 82 at 3. The Plaintiffs cite to "DCS Exh. C" for these two facts; the document in question is actually found at Plaintiffs' Exhibit 4, and, contrary to Plaintiffs' representation, it clearly indicates that a report is to be "screened in" if "*at least one* maltreatment type . . . is marked." Indeed, it is nonsensical to suggest otherwise; a system that prohibited the investigation of, for example, the rape of a child (one of the forms of maltreatment listed) unless it was accompanied by a second type of maltreatment would be a poor system indeed.

4

discussed Tarrance's note and decided that Bishop would leave the children with Morris and go to the DCS office to speak with Tarrance. Tarrance and Bishop discussed the March 6th incident, and Tarrance instructed her to get the children and meet her at Bishop's house so Tarrance could speak with the children.

In the meantime, on April 3, 2013, unbeknownst to Tarrance, an arrest warrant had been issued for Lloyd once it was discovered that he had been mistakenly released from jail. The warrant listed Bishop's apartment as Lloyd's last known address. Defendants Kenny Sanders and Henry Turner, both employees of the Marion County Sheriff's Department assigned to the Warrant Division, went to Bishop's apartment along with two other deputy sheriffs to serve the arrest warrant. When they arrived at the apartment complex, they saw several men near the back entrance of the building in which Bishop lived, including a black male with dreadlocks who quickly entered the apartment building when he saw the officers. Because Lloyd was a black male with dreadlocks who they thought lived in that apartment building, the officers believed that the man they saw was probably Lloyd. They showed Lloyd's photograph to the rest of the men outside the building; the men said they recognized him and that he lived with a woman in Apartment 2B (Bishop's apartment). One of them said that Bishop had told him that the police were looking for her "baby daddy." Based on the information they had, the deputies believed that Lloyd lived in Bishop's apartment and that he had gone inside when he saw the deputies arrive in order to avoid them.

The deputies arranged for the maintenance man at the apartment complex to unlock the apartment; they were at the apartment complex for about an hour before he arrived with the key. They did not find anyone in the apartment. During the search, the deputies kicked in one of the apartment's bedroom doors.

While in the apartment, the deputies saw an envelope in plain view with the Marion County Jail's return address. The envelope was addressed to "Mychel Lynn" at an address on Millersville Road. When they went to that address, they found that it was Morris's residence. Morris told them that Bishop had gone to the DCS office for a meeting and she believed Lloyd might be there with her. She also told them that Bishop drove a grey Chevy Lumina and that the car's back window was missing. Several of the deputies then went to the DCS office in hopes of finding Lloyd there with Bishop.

As Bishop was leaving the DCS office after her meeting with Tarrance, she was stopped by Defendants Turner and Sanders and interrogated about Lloyd's whereabouts. When she told them she did not know where he was, Sanders called her stupid and a liar. She was placed in handcuffs and her identification was run by another deputy, after which she was arrested for driving with a suspended license[5] and failure to produce her vehicle's registration. Defendant Sanders transported her to be processed. On the way, Bishop overheard him make a phone call; she believed he was speaking first to Lloyd's father, and then to Lloyd, telling him that he had arrested Bishop because she was not cooperating and that Lloyd needed to turn himself in.[6]

A short time later, Tarrance learned that Bishop had been arrested from Caudle, who received a text message from another DCS employee informing her of that fact and of the fact that there was an arrest warrant for Lloyd because he had been mistakenly released from jail. Caudle instructed Tarrance to go to Morris's home to make contact with Bishop's children. Tarrance did so, and she and Caudle determined that because Bishop was incarcerated and Lloyd

---

[5] Bishop's license was, in fact, suspended; there is a dispute of fact whether the deputies saw Bishop driving or arrested her before she entered her car to drive away.

[6] Lloyd apparently did so later that day; he eventually pled guilty to two counts of invasion of privacy, and the remaining charges were dismissed.

was being sought by the Sheriff's Department, the best course of action was to detain the children and have them remain with their grandmother. No court order was obtained at that time because it was after hours and the court was closed.

The following day, DCS filed a Verified Petition Alleging Children to Be in Need of Services regarding Bishop's children. The Petition stated that immediate action the previous evening had been necessary because Bishop had been arrested and incarcerated, leaving her unable to care for her children. The petition also stated that the children were in need of services because Bishop and Lloyd had "failed to provide the children with a safe and appropriate living environment free from domestic violence" based upon the March 6th incident. The court granted the petition, found that there was probable cause to believe the children were in need of services, and set a hearing for that afternoon.

Following the hearing, the court found that the removal of the children was necessary to protect them, that it was in the best interests of the children to be removed from Bishop's home, and that the children should remain with Morris. Bishop was authorized to "have parenting time supervised by any adult acceptable to DCS." Lloyd was not to have parenting time until he appeared before the court. It was noted that M.S. was currently with her father while on spring break, and the court authorized her father to continue to have parenting time with her. Further, the court ordered that the children were to be returned to Bishop's care "upon [Bishop] and [DCS] working out a safety plan, referrals being made for homebased services, and upon positive recommendations of DCS, GAL and homebased." Another hearing was scheduled for April 19, 2013.

On April 10, 2013, DCS returned the children to Bishop's home. At the hearing on April 19th, the court noted that the children were in Bishop's home for a "temporary in home trial

7

visit" and authorized that placement to continue. The children remained as wards of DCS, however. At a hearing the following week, that arrangement was continued. Periodic pretrial hearings were held and the children remained in Bishop's home, but as wards of DCS, until a fact finding hearing was held on September 11, 2013. As a result of that hearing, the court determined that the children were not in need of services and they were released to the custody of their parents. On the motion of DCS, the court entered a nunc pro tunc order to "reflect that DCS had to remove the children because [Bishop] was arrested, but at this and [sic] time, the children are not children in need of services any longer." That order was consistent with the judge's oral ruling at the conclusion of the hearing.

## III. DISCUSSION

Tarrance and Caudle move for summary judgment on all of the claims asserted against them in the Plaintiffs' Amended Complaint; the Sheriff Defendants move for summary judgment on all but one of the remaining claims against them.[7]

### B. Defendants Tarrance and Caudle

The first claim asserted against Defendants Tarrance and Caudle in the Plaintiffs' Amended Complaint is found in Count Two, in which Bishop asserts that they violated her substantive due process rights by interfering with her right to "make decisions concerning the care, custody and control of [her] children." Amended Complaint at ¶ 30. Specifically, she alleges that they

---

[7]The Plaintiffs have stipulated to the dismissal of the following claims: (1) the claims against Turner and Sanders for interference with the parent/child relationship asserted in Count Two of the Amended Complaint; (2) the conspiracy claims asserted against the Sheriff's Defendants in Count Three of the Amended Complaint; (3) the state law claims for malicious prosecution/abuse of prosecution asserted against the Sheriff's Defendants; and (4) the children's claims for negligent infliction of emotional distress. Dkt. No. 61.

> interfered in Bishop's parenting rights by arresting, detaining and incarcerating her; by removing the children from her care; by making a dilatorily unwarranted report that Bishop neglected or abused her children; by the filing of a specious and frivolous Petition to Determine that her Children were in need of Services, and by continuing the unwarranted prosecution of said Petition; all of which were done solely to bully her to state the whereabouts of Lloyd, and not for the protection of the Bishop children.

*Id.* at ¶ 31. Tarrance and Caudle move for summary judgment on this claim on several grounds.

First, Tarrance and Caudle argue that to the extent that Count Two asserts claims against Caudle and Tarrance in their official capacities, those claims must be dismissed. The Court agrees. A claim against a state employee in her official capacity is the equivalent of a claim against the state itself, and the state is not subject to suit under § 1983. *Will v. Mich. Dept. of State Police*, 109 S. Ct. 2304 (1989).[8]

Tarrance and Caudle also are sued in their individual capacities. They argue, correctly, that there is no evidence that they had any personal involvement in Bishop's arrest or the complaint of abuse or neglect against her. Because "[a] damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation," *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014), *cert. denied,* 135 S. Ct. 1901 (2015), Tarrance and Caudle cannot be responsible for any constitutional violation based on Bishop's arrest or the initial complaint to DCS against her.

That leaves the Plaintiffs' claims against Tarrance and Caudle based upon their initial removal of her children from her care and their continuing the prosecution of the CHINS petition. In the Amended Complaint, Bishop asserts a due process claim for interfering with her parental rights; however, in their brief the Plaintiffs also argue that the children's rights under the

---

[8]The Plaintiffs' claims against DCS already have been dismissed by stipulation. Dkt. No. 37.

Fourth Amendment were violated when they were removed from Bishop's care without a court order. The Court disagrees.

"The Fourth Amendment's proscription of unreasonable seizures applies in the context of the removal of a child from a home by social welfare workers. In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Xiong v. Wagner*, 700 F.3d 282, 289 (7th Cir. 2012) (citation omitted). Here there can be no dispute that probable cause existed for Tarrance and Caudle to act without a court order. They had been notified that Bishop, the children's custodial parent, had been jailed and therefore was unable to care for them. The children were too young to care for themselves. It was not only reasonable for Tarrance and Caudle to believe there was probable cause to "remove" the children from Bishop's care—Bishop, by her arrest, had already been removed from her role as caretaker for the children, and Tarrance and Caudle had no choice but to find another one for them. Importantly, they acted in such a way as to have the minimum possible effect on the children—Tarrance verified that the children were safe with their grandmother and that their grandmother was willing and able to continue caring for them.[9]

> Reasonableness under the Fourth Amendment is "measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." *Green v. Butler,* 420 F.3d 689, 694 (7th Cir. 2005); *see also Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (in conducting the Fourth Amendment balancing test, "[c]ourts must consider the scope of the particular intrusion ...").

---

[9]The Plaintiffs argue that it was unreasonable to "remove" the children because their grandmother's house was a safe environment. This argument ignores the fact that Tarrance did not, in fact, remove the children from their grandmother's house.

10

*Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011).  Here there is no question that the original detention of the children was reasonable, and Tarrance and Caudle's motion for summary judgment therefore is granted as to the children's Fourth Amendment claim.[10]

Bishop next argues that her substantive due process rights were violated by the children's initial removal.  That claim fails for the same reason as the children's Fourth Amendment claim fails.  *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) (noting that "the parents' substantive due process claims premised on taking [the child] into protective custody . . . stand or fall with [the child's] Fourth Amendment claim premised on his removal").

Bishop, relying on *Hernandez*, also asserts a substantive due process claim based upon the time between her release from jail on the morning of April 4th and the April 5th hearing at which the state court found that probable cause existed.[11]  The court in *Hernandez* found that even though the defendants were entitled to qualified immunity with regard to the initial removal of the plaintiff-child from his home, the child and the parents could assert a separate claim based upon the defendants' continuing to hold the child after learning new information.

> The issue is whether the defendants could have believed that continuing to hold [the child] in protective custody was lawful.  Resolution of this issue turns on the facts and circumstances known to them at the relevant time.  As they obtained additional information that eroded any reasonable basis for believing that [the child] was abused or was in imminent danger of abuse, keeping him in protective custody became unreasonable.

*Id.* at 479.  In this case, Bishop points to no evidence that either Tarrance or Caudle was aware that she was released from jail prior to the court hearing.  Therefore, even assuming that her

---

[10]The Plaintiffs argue that Tarrance and Caudle were required to complete State Form 49584 prior to removing the children.  Even assuming that the form should have been completed, the failure to do so is not relevant to the probable cause analysis.

[11]Bishop impliedly concedes that any potential liability on the part of Tarrance or Caudle ended once the court made its probable cause finding.

release from jail eliminated the legal basis for holding her children without a court order, there is no evidence that Tarrance or Caudle knew that at the relevant time and therefore no evidence that would support a finding that they acted unreasonably.[12] Tarrance and Caudle's motion for summary judgment therefore also is granted as to Bishop's substantive due process claim.

The Plaintiffs also attempt to assert a procedural due process claim on behalf of the children. However, they fail to articulate the basis for that argument and therefore have forfeited it. *See Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) ("It is not this court's responsibility to research and construct the parties' arguments.").

Finally, Tarrance and Caudle move for summary judgment on Count Three of the Amended Complaint, which asserts a claim for conspiracy. The Plaintiffs' response brief does not mention this claim, and the Court agrees with the Defendants that the Plaintiffs have pointed to no evidence that would support it. Accordingly, the motion for summary judgment is granted as to that claim. Tarrance and Caudle also move for summary judgment on the state tort claims asserted against them in the Amended Complaint on the ground that they are entitled to immunity as those claims pursuant to Ind. Code 31-25-2-2.5. The Plaintiffs also do not respond to this argument. As the Plaintiffs fail to point to any evidence that suggests that this provision of Indiana law does not apply to immunize Tarrance and Caudle from liability as to the state law

---

[12]Tarrance and Caudle argue that the Plaintiffs' claims arising from the detention of the children are barred by the *Rooker-Feldman* doctrine. This is incorrect. The Seventh Circuit addressed this exact issue in *Jensen v. Foley*, 295 F.3d 745 (7th Cir. 2002), and held that a state court's determination at a post-removal hearing that probable cause existed to remove and continue to hold a child did not implicate *Rooker-Feldman* because there, like here "the injury the plaintiffs . . . complain of was caused not by the state court's temporary custody order, but by the underlying taking of [the child] by [DCS]." The court in *Jensen* held that although *Rooker-Feldman* did not prohibit the court from exercising jurisdiction over the plaintiffs' case, the doctrine of claim preclusion prohibited the court from reaching the merits. The Defendants do not make that argument in this case, and the Court declines to make it for them.

claims that are asserted against them, their motion for summary judgment is granted as to those claims as well.

## B. Sheriff Defendants

In Count One of the Amended Complaint, Bishop alleges that the search of her apartment by Defendants Sanders and Turner violated her rights under the Fourth Amendment.[13] Specifically, she argues that they were not entitled to enter her apartment to search for Lloyd without a search warrant.

Sanders and Turner entered Bishop's apartment in an attempt to arrest Lloyd pursuant to an arrest warrant.

> "For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York,* 445 U.S. 573, 602, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Of course, the warrant application process does not protect the Fourth Amendment interests of third parties. Thus, if officers enter a third party's residence in order to effect an arrest, the third party herself may have a Fourth Amendment claim against the officers. This is the holding of *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

*United States v. Jackson*, 576 F.3d 465, 467-68 (7th Cir. 2009). Bishop asserts that Lloyd did not live in her apartment and therefore, pursuant to *Steagald*, her Fourth Amendment rights were violated when the officers entered and searched her home without a warrant and in the absence of exigent circumstances.[14]

---

[13]Bishop also asserts a claim against them arising out of her arrest; the Sheriff Defendants concede that there is an issue of material fact with regard to that claim and have not moved for summary judgment as to it.

[14]The Plaintiffs cite to their Exhibit 6, which appears to refer to an audiotape of the sheriff's deputies while they were at the apartment complex. That audiotape is not in the record. However, because it is cited by the Plaintiffs to demonstrate the absence of exigent circumstances, and because whether exigent circumstances existed is irrelevant, that omission from the record has not affected the Court's review of the instant motion.

Bishop's argument misses the mark; she assumes that the relevant question is whether Lloyd did, in fact, reside in her apartment, when what matters for Fourth Amendment purposes is whether Sanders and Turner had probable cause to believe that he resided in her apartment. While it does not appear that the Seventh Circuit has addressed the issue in a published opinion, the Eleventh Circuit has, holding as follows:

> Although searches and seizures inside a home without a search warrant are presumptively unreasonable, in *Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." We have since held that *Payton* requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment's proscription of unreasonable searches. *See [United States v.] Magluta,* 44 F.3d [1530,] 1533 [(11th Cir. 1995)]. In particular, we have held that "first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling." *Id.*

*United States v. Bervaldi*, 226 F.3d 1256, 1262-63 (11th Cir. 2000). The Seventh Circuit has suggested, although not decided, that "reasonable belief" in this context means probable cause. *United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009) ("Were we to reach the issue, we might be inclined to adopt the view of the narrow majority of our sister circuits that 'reasonable belief' is synonymous with probable cause."). As was the case in *Jackson*, however, "we need not decide whether 'reasonable belief' requires probable cause or something less than probable cause because in the present case the police had enough evidence to easily satisfy a probable cause standard." *Id.*

"Probable cause is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances. We objectively step into the shoes of a reasonable person in the position of the officer, and consider the facts known to the officer at the time. We do not consider the subjective motivations of the officer." *Jones v. City of Elkhart,* 737

14

F.3d 1107, 1114 (7th Cir. 2013) (internal citations omitted). In this case, Turner and Sanders were executing a search warrant that listed Bishop's apartment's address as Lloyd's last known address. They also had a copy of the IMPD case report that indicated that Lloyd had been arrested in that apartment fewer than thirty days earlier for what was described as a "live-in boyfriend/girlfriend" incident that involved an argument about Lloyd "being home so late." In addition, when they questioned the people outside of the apartment building, they indicated that Lloyd lived in the apartment. Bishop points to no information that Turner and Sanders had that suggested that Lloyd did not reside in the apartment. Because a reasonable officer would conclude that Lloyd lived in the apartment based on the information that Turner and Sanders had at the time of the search, the Court finds that they had probable cause to believe that Lloyd resided in Bishop's apartment. The Court also finds that Turner and Sanders had probable cause to believe that Lloyd was in the apartment at the time they entered it, based upon their observation that a man matching Lloyd's general description quickly entered the apartment building in question when he saw them approach, their reasonable belief that he lived in that apartment building, and their knowledge that Lloyd likely knew that law enforcement officers were looking for him. Accordingly, Bishop has not demonstrated that the search of Bishop's apartment building based upon the warrant for Lloyd's arrest violated her Fourth Amendment rights, and Turner and Sanders' motion for summary judgment is granted as to that claim.

Next, the Marion County Sheriff moves for summary judgment on Count IV of the Amended Complaint, in which the Plaintiffs allege that the Sheriff "has a widespread practice of mistakenly releasing inmates from the Jail or court and employing 'scorched earth' search and seize campaigns in search of these inmates." Amended Complaint at ¶ 36. The Plaintiffs point to no evidence to support this claim; the three news stories they cite for the proposition that the

15

Sheriff "is obviously aware of the many early releases of inmates from jail" are inadmissible hearsay, and in any event they cite to no evidence in support of their allegation that the Sheriff conducts "scorched earth campaigns" to arrest inmates who are mistakenly released.  In addition, the Plaintiffs point to no evidence that the Sheriff was responsible for Lloyd's mistaken release from jail; the uncontroverted evidence of record demonstrates that Lloyd was released due to a mistake by an employee of the Marion Superior Court.  Accordingly, the Sheriff's motion for summary judgment is granted as to Count IV.

Turner and Sanders also move for summary judgment on Bishop's state law claims for (1) false arrest and false imprisonment; (2) slander; and (3) the negligent infliction of emotional distress.  Bishop does not address these claims in her response brief.  "Under the Indiana Tort Claims Act, there is no remedy against the individual employee so long as he was acting within the scope of his employment." *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) (citing Ind. Code § 34–13–3–5(b) and *Julian v. Hanna,* 732 F.3d 842, 848–49 (7th Cir. 2013)).  As Bishop fails to point to any evidence that suggests that this provision of Indiana law does not apply to immunize Sanders and Turner from any liability for her remaining state law claims, their motion for summary judgment is granted as to those claims.

## IV.  CONCLUSION

For the reasons set forth above, the Defendants' motions for summary judgment (Dkt. Nos. 62 and 71) are **GRANTED** in their entirety.  The Court believes that all claims against Defendants DCS, Tarrance, and Caudle have now been resolved and the only claim that remains against the Sheriff Defendants is Bishop's claim for violation of her Fourth Amendment rights arising out of her arrest as set forth in Count One.  This cause will be set for a jury trial on that remaining claim by separate Entry.

SO ORDERED: 9/23/15

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification